**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen, Esq.
609 W. South Orange Avenue, Suite 2P
South Orange, NJ 07079
Tel: (973) 313-1887
Fax: (973) 833-0399
Email: lrosen@rosenlegal.com

*Counsel for Lead Plaintiff*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| *In re Cancer Genetics, Inc. Securities Litigation* | Civ. No. 18-5612 (ES) (SCM)<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>JURY TRIAL DEMANDED |

Lead Plaintiff Randy Clark ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and

1

regarding Cancer Genetics, Inc. ("Cancer Genetics" or the "Company"), analysts' reports and advisories about the Company, interviews with former employees of Cancer Genetics, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of a class consisting of all persons and entities, other than Defendants, who purchased or otherwise acquired the common stock of Cancer Genetics from March 10, 2016 through April 2, 2018, inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").[1]

2.     During the Class Period, Defendants repeatedly and falsely touted the seamless integration of Response Genetics, Inc. ("Response Genetics"), a company that Cancer Genetics acquired shortly before the start of the Class Period.  The integration was actually anything but seamless.  Defendants failed to disclose that Cancer Genetics was having severe problems integrating Response Genetics'

---

[1] Excluded from the Class are Defendants, present and former officer and directors of the Company, members of such excluded persons' immediate families and their legal representatives, heirs, successors or assigns, and any entity in which any such excluded person have or had a controlling interest.

2

billing and invoices systems.  Ultimately, on April 2, 2018 – approximately 2.5 years after it acquired Response Genetics – Cancer Genetics revealed that its inability to integrate Response Genetics' invoices and billing system caused it to have to record a $4.4 million bad debt expense, write off $1.8 million of its accounts receivable, and declare that its internal controls over financial reporting were ineffective.  Cancer Genetics also announced that as a result of the large bad debt expense, the Company was in default of its loan covenant with its lenders.

3.     Defendants needed to conceal the Response Genetics integration problems because Cancer Genetics was trying to raise money during the Class Period and conducted several public offerings and private placements of its securities.  On May 25, 2016, Cancer Genetics raised $5 million in an offering of common stock and warrants.  On September 14, 2016, it raised an additional $5.5 million in another offering of common stock and warrants.  Finally, on December 8, 2017, the Company raised $7 million in a public offering of common stock. Indeed, Cancer Genetics admitted in its SEC filings that it had severe cash flow problems and was dependent on financing from the public offerings just to stay afloat.  If the public had been aware of Cancer Genetics' failure to integrate Response Genetics, or the resulting bad debt write off and loan covenant default, Cancer Genetics would have had a much more difficult time getting investors to buy its securities in the public offerings and private placements.

4.      Cancer Genetics describes itself as an "emerging leader" in DNA-based cancer diagnostics.   The Company primarily engages in the business of diagnosing, monitoring, and informing cancer treatment.

5.      On August 10, 2015, Cancer Genetics announced that it had reached an agreement in principle to purchase a bankrupt Los Angeles-based company called Response Genetics.  Response Genetics specialized in solid tumor molecular diagnostics, and the acquisition of Response Genetics was part of Cancer Genetics' efforts to expand its national reach while augmenting its clinical services offering.

6.      Cancer Genetics finalized and closed its acquisition of Response Genetics on October 12, 2015.

7.      In Cancer Genetics' October 12, 2015 press release announcing the transaction, Defendant Panna Sharma touted the anticipated "seamless integration" of Response Genetics and boasted of "capturing synergies" between the two companies.

8.      Likewise, on a November 10, 2015 conference call, Defendant Edward Sitar stated that he was "very pleased" with the progress that has been made with regards to the integration of Response Genetics.   Sitar specifically stated that "we've been able to move quickly to rationalize…billing [.]"  To further allay concerns over integration, Sitar claimed that "a majority" of Response

Genetics' staff had been retained and brought into Cancer Genetics' existing structure.

9.     At the time that Cancer Genetics acquired Response Genetics, Defendants knew that Response Genetics' finances were in shambles, that it was having problems collecting on its accounts receivables, and that many of its diagnostic tests were not getting approved by Medicaid and Medicare for reimbursement.   In light of these serious problems, Defendants knew that successful integration of Response Genetics, particularly its billing and invoicing systems, would be a challenge.

10.     Yet, Defendants did not have a well-thought out plan for integration, and instead approached the integration process with a laissez-faire, "we'll figure it out as we go" attitude, sweeping issues under the rug and concealing problems from investors.

11.     To make matters worse, rather than retaining Response Genetics' employees to help ensure a smooth integration, Defendant Sitar quickly ordered the firing of the entire accounting and finance team that Cancer Genetics inherited from Response Genetics.

12.     Hence the integration process was a disaster.  Cancer Genetics used a billing system called Xifin, while Response Genetics used a system called LIM. After it acquired Response Genetics, Cancer Genetics sought to upgrade Xifin so

that the two billing systems (i.e. Cancer Genetics' and Response Genetics') could "talk to each other". Despite pouring thousands of dollars into this endeavor, Cancer Genetics could not sync the two systems.

13.     As a result, Cancer Genetics' billing system didn't integrate any of Response Genetics' invoices or bills. This led to an untenable situation where the Company's accounting team acted like it was running two different companies in two different locations. Any invoice from after October 2015 was considered a Cancer Genetics invoice, and entered into Cancer Genetics' billing system. Any invoice from before October 2015 stayed in Response Genetics' system because Cancer Genetics could not migrate or sync the two systems. And yet, Cancer Genetics fired the entire Response Genetics accounting team shortly after its acquisition, so that Cancer Genetics' personnel were left scrambling trying to figure out Response Genetics' accounting system and understand the status of invoices and accounts receivables, which were already in bad shape. This process became highly disorganized and turned into a situation where nobody had a good grasp over Response Genetics' old invoices and accounts receivables.

14.     Yet, throughout the Class Period, Defendants continually and falsely reassured the public that the integration of Response Genetics was going smoothly. On a March 3, 2016 earnings call, Defendant Sharma stated that Cancer Genetics had finished the integration process. Defendant Sharma further and specifically

6

misrepresented that Cancer Genetics had been able to integrate and streamline billing and finance.

15.     As late as March 23, 2017, Defendant John A. Roberts still falsely touted the "highly successful integration" of Response Genetics.

16.     In Cancer Genetics' SEC filings during the Class Period, it represented that the Company's internal controls over financial reporting were effective.

17.     On December 8, 2017, Cancer Genetics announced the pricing for the $7 million December 12, 2017 direct offering, pricing the Company's common stock at $2 per share.

18.     Finally, on April 2, 2018, approximately *two and a half years* following the acquisition of Response Genetics, and after raising more than $17 million from investors in the meantime, Cancer Genetics revealed that due to problems stemming from the integration of Response Genetics' invoices into Cancer Genetics' billing platform, Cancer Genetics would be writing off $1.8 million in accounts receivables and recording a bad debt expense of $4.4 million. It further revealed that as a result of these large bad debt expenses, Cancer Genetics was in default of its loan covenant with lenders. It also revealed that the Company's internal controls over financial reporting were not effective.

19.    Immediately following these adverse disclosures, shares of Cancer Genetics common stock fell $0.55 per share, or over 33% from its previous closing price, to close at $1.10 per share on April 3, 2018, damaging Plaintiff and other Cancer Genetics investors.

20.    Indeed, Defendants Sharma and Sitar have a history of hiding negative information in order to not affect the Cancer Genetics's stock price. Sharma and Sitar refused to file criminal charges against Cancer Genetics' former Director of Reimbursements and Clinical Revenue Cycle, Randy Goodman, even though Goodman stole $100,000 from the Company and submitted false expense reports, because Sharma and Sitar did not want the negative news to get out and affect the Company's stock price.  Defendant Sharma's bonus was directly tied to Cancer Genetics' stock price, giving him motive to conceal bad news.

21.    Because of their part in this fraud, Defendants Sharma and Sitar – the CEO and CFO of the Company, respectively – were both fired by Cancer Genetics' Board of Directors.  Defendant Sharma remains unemployed to this day.

## JURISDICTION AND VENUE

22.    The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and §78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

23.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

24.     Venue is proper in this District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as the Company's principal executive offices are located in this District and the Company conducts business in this District.

25.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## **PARTIES**

26.     Plaintiff, as set forth in his PSLRA certification previously filed with the Court, purchased Cancer Genetics securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosure.

27.     Defendant Cancer Genetics is a Delaware corporation with its principal executive offices located in Rutherford, New Jersey. Cancer Genetics touts itself as an emerging leader in the field of personalized medicine, offering

diagnostic products and services that enable precision medicine in the field of oncology. The Company trades on NASDAQ under the ticker symbol "CGIX."

28.    Defendant Panna L. Sharma ("Sharma") was the Chief Executive Officer ("CEO") of Cancer Genetics from the beginning of the Class Period until February 2, 2018, when he was forced to resign by Cancer Genetics' Board of Directors for his poor job performance.

29.    Defendant Edward J. Sitar ("Sitar") was the Chief Financial Officer ("CFO") of Cancer Genetics from the beginning of the Class Period until February 3, 2017, when he was fired for his poor performance in overseeing the Company's financial and accounting operations.

30.    Defendant John A. Roberts ("Roberts") was the Chief Operating Officer ("COO") and Executive Vice President of Finance from July 11, 2016 until February 2, 2018, when he became Interim CEO of the Company.

31.    Defendant Igor Gitelman ("Gitelman") has been the Chief Accounting Officer ("CAO") of Cancer Genetics since February 13, 2017.

32.    Defendants Sharma, Sitar, Roberts, and Gitelman are sometimes referred to herein as the "Individual Defendants."

33.    Each of the Individual Defendants:

(a)    directly participated in the management of the Company;

(b)     was directly involved in the day-to-day operations of the Company at the highest levels;

(c)     was privy to confidential proprietary information concerning the Company and its business and operations;

(d)     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)     was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)     was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g)     approved or ratified these statements in violation of the federal securities laws.

34.     The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

35.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

36.     The Company and the Individual Defendants are referred to herein, collectively, as the "Defendants."

## CONFIDENTIAL WITNESSES

37.     Confidential Witness 1 ("CW1") was the Director of Sales, Western Region, at Cancer Genetics from March 2015 to March 2018.  CW1 reported to Greg Ash, Vice President of Sales at Cancer Genetics.

38.     Confidential Witness 2 ("CW2") was a Business Functional Analyst at Cancer Genetics from August 2016 to January 2017.  CW2 reported to Richard Dotson, Cancer Genetics' Chief Investment Officer and Vice President of Information Technology.

39.     Confidential Witness 3 ("CW3") was the Human Resources and Talent Development Leader at Cancer Genetics from August 2015 to August 2016.  CW3 reported to Defendant Sharma for the first nine months of her employment at Cancer Genetics, and then to Defendant Roberts for the remaining three months.

40.     Confidential Witness 4 ("CW4") was the Human Resources Manager at Cancer Genetics from December 2015 to June 2018.  CW4 first reported to the

VP of Human Resources, Molly Lukes, and then to Defendant Roberts after July 2016.

41.    Confidential Witness 5 ("CW5") was a medical collector for Response Genetics and then for Cancer Genetics, serving in that role from September 2014 to June 2018.  CW5 first reported to Linda Franco and Ashley Rincon at Response Genetics.  After Cancer Genetics acquired Response Genetics, CW5 reported to Raechelle Spleight, a Billing Supervisor at Cancer Genetics.

## ALLEGATIONS OF FRAUD

### Background: Cancer Genetics Acquires the Bankrupt Response Genetics

42.    On August 10, 2015, Cancer Genetics announced that it had reached an agreement in principle to acquire Response Genetics.  Response Genetics specialized in the molecular diagnostics of solid tumors.  For New Jersey-based Cancer Genetics, the acquisition of Response Genetics would allow the Company to expand its clinical offerings and presence to the western and southwestern regions of the U.S.

43.    Response Genetics was formerly a NASDAQ-listed company that had fallen on hard times.  It was delisted by NASDAQ in July 2015.  At the same time that Response Genetics announced that it had reached an agreement in principle for Cancer Genetics to acquire it, Response Genetics filed for Chapter 11 bankruptcy.

44.    Financially, Response Genetics was a mess at time of Cancer Genetics' acquisition.   Per its bankruptcy filings, Response Genetics had total assets of approximately $10.8 million and total debt of $15.7 million as of March 31, 2015.   Furthermore, in its Form 10-Q for the first quarter ended March 31, 2017, Response Genetics reported an accumulated deficit of $83 million.

45.    According to CW3, as part of Cancer Genetics' due diligence investigation into Response Genetics prior to the acquisition, Defendants Sharma and Sitar learned that they were acquiring a company with serious accounts receivable collection problems.   Moreover per CW3, both Defendant Sharma and Defendant Sitar were aware, from the pre-purchase due diligence investigation, that Response Genetics had "a lot of accounting issues" in general.

46.    According to CW1, it was also a widely known fact at Cancer Genetics that at the time of its acquisition of Response Genetics, the latter company was having major problems getting reimbursed by Medicaid and other insurers.   CW2 said that it was partly because Response Genetics sales people were so eager to generate sales that they were selling cancer diagnostic tests that were not yet approved by Medicaid and Medicare.   As such, additional information was needed in order to get reimbursed by Medicaid and Medicare.   The Medicaid reimbursement problem became so severe that at the time of its sales to Cancer Genetics, Response Genetics had stopped accepting Medicaid patients.

14

47.     By all accounts, Cancer Genetics was acquiring a company that was in shambles, and rife with accounting issues.  Cancer Genetics' pre-acquisition due diligence informed Defendants that integration would be no easy task.

48.     On October 12, 2015, Cancer Genetics announced that it had completed the acquisition of Response Genetics.  In the press release announcing the close of this purchase, Defendant Sharma painted a rosy picture of the integration process, stating that he's looking forward to a "seamless integration" of Response Genetics.

49.     On a November 11, 2015 earnings call, Defendant Sitar doubled down on Defendant Sharma's statement, stating that as to the integration of Response Genetics, he's "very pleased with the progress we have made in just four weeks after closing this acquisition."  Defendant Sitar specifically mentioned the integration of billing, telling the public that Cancer Genetics had been able to "move quickly to rationalize" billing.

50.     To further assuage the investing public's concerns over the integration of Response Genetics into Cancer Genetics, Defendant Sitar stated on the November 11, 2015 earnings call that "a majority of the Response staff" had been retained and brought into Cancer Genetics' existing team.

***Easier Said than Done: Integration Becomes a Debacle***

51.     According to CW3, it was common knowledge at Cancer Genetics that Defendant Sharma liked to buy companies that were well-matched with Cancer Genetics' business and were going under or about to go under.  Response Genetics was one such company.

52.     The problem, however, was that Defendant Sharma and Sitar, as CEO and CFO, had no plan in place for integrating Response Genetics.  CW3 attended multiple meetings with Defendants Sharma and Sitar during the fall of 2015 in which CW3 tried to get them to discuss their "game plan" for integrating Response Genetics.  But Sharma and Sitar had no concrete plan.  Their attitude was simply "we'll figure it out as we go."

53.     This laissez faire attitude was a recipe for disaster, especially when it came to integrating the two companies' billing and accounting systems.  According to CW4, Cancer Genetics' billing system was Xifin.  Response Genetics, on the other hand, used the LIM software to store billing and invoice data.  Cancer Genetics initially tried to upgrade its Xifin system so that it could sync with the LIM system (i.e. make the two systems "talk to each other").  This failed completely.

54.     As a result, Cancer Genetics' billing system didn't integrate any Response Genetics' invoices or bills.  Hence after the acquisition, the billing and

invoicing were done as if Response Genetics and Cancer Genetics were still two different companies.   For example, according to CW5, Response Genetics' invoices from before October 2015 stayed in Response Genetics' system, while anything from after October 2015 was considered a Cancer Genetics invoice.

55.   CW5 said that this led to a messy situation where, for example, if a test was performed by Response Genetics in June 2015 and it awaiting payment, and someone contacted Cancer Genetics to inquire about it, Cancer Genetics' billing system would show no record of this test.  CW5 or another employee would then have to pull up Response Genetics' old system – which nobody at Cancer Genetics was trained in – to see if there was any information about the bill.  This ad hoc process led to many invoices, accounts receivables and request for additional information slipping through the cracks and going unattended.

56.   Even though Cancer Genetics still had to use Response Genetics' billing system due to the failure to integrate Xifin and LIM, Cancer Genetics exacerbated the integration efforts by letting go the entire Response Genetics finance and accounting team, who were the only persons familiar with and trained in Response Genetics' billing software.

57.   According to CW3, in late 2015, Defendant Sitar ordered her to fire the entire Response Genetics finance and accounting team even though Sitar knew that Response Genetics' accounts receivables were in disarray.  Indeed, when CW3

carried out the order to fire the Response Genetics' accounting team, several of those terminated employees expressed shock because they felt that Cancer Genetics needed them in accounting and finance given Response Genetics' chaotic accounting situation and the integration difficulties.  CW3 told Defendant Sitar that the former Response Genetics employees were necessary for the integration process, but Sitar ignored this feedback from her.

58.    CW5 said that a short time after the acquisition, Cancer Genetics put together a small team to collect on Response Genetics' accounts receivables.  CW5 remembers the first names of three individual on that team: Kevin, Gary, and Ashley.  However, Cancer Genetics suddenly and inexplicably fired this entire team a short time after it was formed. CW5 doesn't know why there were fired, or who then became responsible for overseeing and collecting Response Genetics' accounts receivables.  CW5 does recall that Cancer Genetics eventually hired an accountant at some point in 2016 or 2017 to work in the California facility (i.e. former Response Genetics site), but that person was fired six months later because he did not understand medical coding or medical billing.

59.    According to CW4, Cancer Genetics had no system in place to identify bad debt that it inherited from Response Genetics, even though CW4 and all of CW4's superiors knew that Response Genetics had a lot of accounts receivables and problems collecting on past due invoices.  CW4 said if there was a

system in place to identify and evaluate bad debt, CW4 would have been aware of it.

**Defendants' Misleading Statements Touting Integration Success**

60.    The integration process, particularly in the billing and accounting department, was in shambles.  Yet, during the Class Period, Defendants repeatedly and misleadingly touted the supposed "success" of the integration process.

61.    On a March 3, 2016 earnings call, Defendant Sharma said that "we have integrated Response Genetics[.]"  Defendant Sharma went on to elaborate that "Since closing the acquisition in October, we streamlined operations significantly by *integrating sales, billing, finance,* IT… [.]"

62.    On the same call, Defendant Sitar also falsely touted the seamless success of the integration process: "As [Sharma] noted, *we've integrated sales, billing, finance*, IT, biopharma operations and quality assurance."

63.    Defendants also touted their supposed success collecting on Response Genetics' accounts receivables.

64.    On an August 10, 2016 earnings call, Defendant Sitar said: "I'm happy to report we have made significant progress in this area and have input and billed about 90% of the claims that were delayed due to system integrations from the West Coast clinical lab."  Defendant Sitar also noted on the same call that "we're recording and collecting [the accounts receivables]."

19

65.   On November 10, 2016, Defendant Sitar falsely touted on another earnings call that "collections are good," and that over the next two or three quarters, the Company would be able to get the accounts receivables down to a "normalized level of receivables."

66.   On March 23, 2017, Defendant Roberts again misled the public about the integration of Response Genetics, falsely stating that: "So since our last conference call, we've continued strong organic revenue growth, as well as revenue *from the highly successful integration* of [Response Genetics]."

**Defendants' False Statements Touting Effective Internal Controls**

67.   Defendants also falsely claimed to have effective internal controls over financial reporting during the Class Period.

68.   On March 23, 2017, Cancer Genetics filed a Form 10-K annual report for the fiscal year ended December 31, 2016 (the "2016 10-K") with the SEC. Defendants Sharma, Roberts, and Gitelman all signed the 2016 10-K.  The 2016 10-K also contained certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), signed by Defendants Sharma and Roberts, attesting to the accuracy of financial reporting and disclosure of any material changes to the Company's internal controls over financial reporting.

69.   Defendants falsely represented in the 2016 10-K that Cancer Genetics maintained effective internal controls over financial reporting:

**Item 9A.**                              **Controls and Procedures.**

*Evaluation of Disclosure Controls and Procedures.*
We evaluated, under the supervision and with the participation of our principal executive officer and principal financial officer, the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities and Exchange Act of 1934 ("Exchange Act"), as amended) as of December 31, 2016, the end of the period covered by this report on Form 10-K. ***Based on this evaluation, the principal executive officer and the principal financial officer have concluded that our disclosure controls and procedures were effective at December 31, 2016***.

***Based on management's assessment, as of December 31, 2016, the Company's internal control over financial reporting was effective.***

\*      \*      \*

*Changes in Internal Control over Financial Reporting.*
There were no changes in our internal control over financial reporting during the three months ended December 31, 2016 that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.

(Emphasis added).

70.    On May 12, 2017, the Company filed its Form 10-Q with the SEC which provided the Company's financial results for the first quarter of 2017 ending March 31, 2017 (the "1Q17 10-Q"). Defendants Sharma, Roberts, and Gitelman all signed the 1Q17 10-Q.  The 1Q17 10-Q contained signed SOX certifications by Defendants Sharma and Roberts attesting to the accuracy of financial reporting and the disclosure of any material changes to the Company's internal controls over financial reporting.

71.     Defendants falsely represented in the 1Q17 10-Q that Cancer Genetics

maintained effective internal controls over financial reporting:

**Item 4.        Controls and Procedures**

*Evaluation of Disclosure Controls and Procedures*

We evaluated, under the supervision and with the participation of the
principal executive officer and principal financial officer, the
effectiveness of the design and operation of our disclosure controls
and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under
the Securities and Exchange Act of 1934 ("Exchange Act"), as
amended, as of March 31, 2017, the end of the period covered by this
report on Form 10-Q. ***Based on this evaluation, our President and
Chief Executive Officer (principal executive officer) and our Chief
Operating Officer (principal financial officer) have concluded that
our disclosure controls and procedures were effective at the
reasonable assurance level at March 31, 2017.***

                         *        *        *

*Changes in Internal Control over Financial Reporting*

***There were no changes in our internal control over financial
reporting during the three months ended March 31, 2017 that have
materially affected, or are reasonably likely to materially affect, the
Company's internal control over financial reporting.***

(Emphasis added).

72.     On August 14, 2017, the Company filed its Form 10-Q with the SEC

which provided the Company's financial results for the second quarter of 2017

ended June 30, 2017 (the "2Q17 10-Q"). Defendants Sharma, Roberts, and

Gitelman all signed the 2Q17 10-Q.   The 2Q17 10-Q contained signed SOX

certifications by Defendants Sharma and Roberts attesting to the accuracy of

financial reporting, and the disclosure of any material changes to the Company's

internal controls over financial reporting.

73.   The 2Q17 10-Q discussed Cancer Genetics' controls and procedures,

stating in relevant part:

### Item 4.       Controls and Procedures

*Evaluation of Disclosure Controls and Procedures*

We evaluated, under the supervision and with the participation of the
principal executive officer and principal financial officer, the
effectiveness of the design and operation of our disclosure controls
and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under
the Securities and Exchange Act of 1934 ("Exchange Act"), as
amended, as of June 30, 2017, the end of the period covered by this
report on Form 10-Q. ***Based on this evaluation, our President and
Chief Executive Officer (principal executive officer) and our Chief
Operating Officer (principal financial officer) have concluded that
our disclosure controls and procedures were effective at the
reasonable assurance level at June 30, 2017.***

\*        \*        \*

*Changes in Internal Control over Financial Reporting*

***There were no changes in our internal control over financial
reporting during the three months ended June 30, 2017 that have
materially affected, or are reasonably likely to materially affect, the
Company's internal control over financial reporting.***

(Emphasis added).

74.   On November 13, 2017, the Company filed its Form 10-Q with the

SEC which provided the Company's financial results for the third quarter of 2017

ended September 30, 2017 (the "3Q17 10-Q").  Defendants Sharma, Roberts, and

Gitelman all signed the 3Q17 10-Q.   The 3Q17 10-Q contained signed SOX certifications by Defendants Sharma and Roberts attesting to the accuracy of financial reporting, and the disclosure of any material changes to the Company's internal controls over financial reporting.

75.    The 3Q17 10-Q Cancer Genetics' controls and procedures, stating in relevant part:

**Item 4.        Controls and Procedures**

*Evaluation of Disclosure Controls and Procedures*

We evaluated, under the supervision and with the participation of the principal executive officer and principal financial officer, the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities and Exchange Act of 1934 ("Exchange Act"), as amended, as of September 30, 2017, the end of the period covered by this report on Form 10-Q. ***Based on this evaluation, our President and Chief Executive Officer (principal executive officer) and our Chief Operating Officer (principal financial officer) have concluded that our disclosure controls and procedures were effective at the reasonable assurance level at September 30, 2017.***

*            *            *

*Changes in Internal Control over Financial Reporting*

***There were no changes in our internal control over financial reporting during the three months ended September 30, 2017 that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.***

(Emphasis added).

76.    The above statements that Cancer Genetics' internal controls over financial reporting were effective were false and misleading because Cancer Genetics had no system in place, and was unable to, identify bad debt that it inherited from Response Genetics.  Moreover, Cancer Genetics had been unable to integrate Response Genetics' invoice and billing system, and therefore, could not properly respond to requests for additional information needed to get claims and invoices paid.

**The Truth Emerges**

77.    After market close on April 2, 2018, two-and-a-half years after Cancer Genetics acquired Response Genetics, Defendants finally revealed that they had been unable to integrate Response Genetics' invoices and billing system into Cancer Genetics' system, and as a result, they had been unable to properly record or collect the accounts receivables.  Because of the failed integration and that a substantial portion of outstanding accounts receivable would not be collected, Cancer Genetics would be writing off $1.8 million in accounts receivables, recording a bad debt expense of $4.4 million, and record a revenue reversal of $1.6 million in the fourth quarter of 2017.

78.    Defendant Roberts offered this explanation during the April 2, 2018 earnings call, which took place after market close:

> We engaged with third-party consultants with the tools necessary to gain greater visibility into receivables and determine that

25

the majority of our cash collection challenges were **related to our acquisition of Response Genetics and the integration of their invoices into our billing platform**. Some of these claims, which were denied for a variety of reasons, date back as far as 2015.

We're continuing our efforts to collect on all of these claims, but based on the information that's now available to us, we made the decision to write off a significant portion of our outstanding receivables in the fourth quarter. **This resulted in a bad debt expense of $4.4 million and $1.8 million write-off against accounts receivables and a revenue reversal of $1.6 million in the fourth quarter.**

79.     During the same call, Defendant Roberts also disclosed that "as a result of recording a large bad debt, we triggered a default in our loan covenants with our senior lenders."

80.     Further, after the market closed on the same day, Cancer Genetics issued a press release entitled, "Cancer Genetics Reports Fourth Quarter and Full Year 2017, Financial Results and Provides Strategic Business Updates." The press release stated in relevant part:

While the Company continues with its collections efforts on all claims, in the fourth quarter it recorded a bad debt expense of $4.4 million and wrote off $1.8 million of its accounts receivable, with a significant portion of the bad debt expense and write off related to collection issues with respect to the ***accounts receivable recorded subsequent to the 2015 acquisition of Response Genetics Inc***. Payors have declined to reimburse the Company on certain performed Clinical services due to delays in filing its claims, the demands by payors for copies of patient medical records or diagnosis codes which have been difficult to obtain, and reimbursement challenges for certain of our next generation sequencing tests by Medicare and third-party managed care plans, among other reasons.

26

81.     Also on April 2, 2018, Cancer Genetics filed its Form 10-K for the fiscal year ended December 31, 2017 (the "2017 10-K") with the SEC. The 2017 10-K revealed that Cancer Genetics' internal controls over financial reporting were ineffective, stating in relevant part:

**Item 9A.   Controls and Procedures.**

*Evaluation of Disclosure Controls and Procedures.*

We evaluated, under the supervision and with the participation of our principal executive officer and principal financial officer, the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities and Exchange Act of 1934 ("Exchange Act"), as amended) as of December 31, 2017, the end of the period covered by this report on Form 10-K. ***Based on this evaluation, the principal executive officer and the principal financial officer have concluded that our disclosure controls and procedures were not effective at December 31, 2017 as a result of the material weakness in internal controls described below.***

\*       \*       \*

***In connection with this assessment, we identified a material weakness, as described below, in our internal control over financial reporting as of December 31, 2017.***

\*       \*       \*

Accounting for uncollectible clinical services revenue:   The Company's quarterly and year- end review procedures includes management's assessment of collectability and adjustment of its allowance for doubtful accounts. ***During the fourth quarter management revised its estimation process and as a result of the low collection patterns during the fourth quarter principally related to clinical service revenues from claims generated by the Los Angeles location, a determination was made to significantly increase the***

27

*allowance for doubtful accounts to reflect this change in estimate, and our management has determined that this control deficiency constitutes a material weakness at December 31, 2017. However, the Company failed to identify that adjustments which pertained to contractual allowances and reduced expected collections of current quarter revenues should have been recorded as reductions in net revenue rather than bad debt expense.*

82.    On these adverse news, shares of Cancer Genetics fell $0.55 per share or over 33.3% from its previous closing price to close at $1.10 per share on April 3, 2018, damaging investors.

83.    It is no surprise that the market reacted so adversely to this material news.  Cancer Genetics only had $27 million and $29 million in total revenue in 2016 and 2017, respectively.  Hence the $4.4 million bad debt expense and $1.8 million write-off were extremely significant to the Company's financial performance.

## ADDITIONAL ALLEGATIONS EVIDENCING SCIENTER AND INEFFECTIVE INTERNAL CONTROLS AT CANCER GENETICS

### Cancer Genetics was Struggling Financially and Needed to Raise Money

84.    During the Class Period, Cancer Genetics was bleeding money and its financials were in woeful shape, making fund-raising a necessity.  The Company recorded $15 million and $20 million in net loss in 2016 and 2017, respectively.

85.    In its 2016 10-K, Cancer Genetics admitted that "Management evaluated the history and operational losses to have a material effect on our ability to continue as a going concern, unless we take actions to alleviate those conditions.

Our primary sources of liquidity have been funds generated from our debt financings and equity financings." In other words, the Company was in desperate need of additional funding, and was dependent on money raised through secondary offerings of its securities just to stay afloat.

86.    In the 2017 10-K, Cancer Genetics again admitted that "Our recurring losses from operations have raised substantial doubt regarding our ability to continue as a going concern."

87.    CW2 also confirmed that the Company was in dire straits financially. CW2 said that many vendors refused to extend credit to Cancer Genetics, demanding cash payment instead. CW2 also stated that the Company often had trouble paying its bills.

88.    Desperate for additional funding, Cancer Genetics during the Class Period conducted multiple offerings of its securities to raise funds:

  •    On May 25, 2016, Cancer Genetics raised $5 million in a public offering of common stock and private placement of warrants.

  •    On September 14, 2016, it raised an additional $5.5 million in another offering of common stock and warrants.

  •    On December 8, 2017, the Company raised $7 million in a public offering of common stock.

89.    Because the Company's survival was dependent on its ability to raise money, it could not afford to let the investing public know of the problem it was having integrating Response Genetics.  Or that Cancer Genetics had defaulted on its loan covenants.  Both of which would have severely hampered Cancer Genetics' ability to attract investors and raise money.  Hence Defendants were all eager to falsely tout the supposed "seamless" and "highly successful" integration of Response Genetics.

***Defendant Sharma and Sitar's Obsession with Maintaining High Stock Price***

90.    Both Defendants Sharma and Sitar were obsessed with maintaining a high stock price for Cancer Genetics and were eager to sweep issues under the rug if they would negatively impact the Company's stock price.

91.    For example, CW3 said that in early 2016, management discovered that Randy Goodman, Cancer Genetics' Director of Reimbursements and Clinical Revenue Cycle, had stolen $100,000 from the Company and submitted false expense reports.  CW4 also corroborated CW3's statement that Goodman stole from the Company.

92.    CW3 recommended to Defendants Sharma and Sitar that criminal charges be filed against Goodman.  Both Sharma and Sitar, however, said no, because it would become public knowledge (that a high-level employee was stealing from the Company) and negatively affect the Company's stock price.

93.     Coincidentally, according to CW3, Goodman oversaw a team in California that was tasked with figuring out Response Genetics' accounts receivables.  Goodman was fired in the spring of 2016.

94.     According to CW4, Defendant Sharma's bonus was tied to the Company's stock price.  CW4 said that Sharma was "mad" that he didn't get a bonus in 2015 because the stock price was too low.  CW4 recalls at some point in 2017, CW4 was at a meeting with Sharma in North Carolina when the price of Cancer Genetics went over $4 per share.  Sharma was very excited because it meant that he would get his bonus for 2016.

**Rampant Incompetence at Cancer Genetics**

95.     CW4 said that at Cancer Genetics, employees in accounting and finance were often forced into performing duties in which they had no familiarity and were not trained.  For example, CW4 was forced to do tax report and IRS filings even though she had no training in either area because at Cancer Genetics people "wear many hats."  Defendant Sitar gave no help or guidance; employees just had to figure things out on their own.

96.     CW4 said that Defendant Gitelman was way above his head as Chief Accounting Officer, and "didn't know what he was doing."

97.     Following the acquisition of Response Genetics, CW4 was put in charge of integrating Response Genetics into Cancer Genetics' payroll system.

Defendant Sitar decided to use a company called Paylocity to integrate the two payroll systems.  However, CW4 felt that Paylocity was "too basic" and created many limitations and challenges for the HR team.  Defendant Sitar ignored the feedback.

### *Defendants Sharma and Sitar were both Fired*

98.    On January 6, 2017, Cancer Genetics announced that it had fired Defendant Sitar.  According to CW3, there had been rumblings in late 2016 that the Company wanted to fire Sitar because of his poor performance managing the finance and accounting operations.

99.    On February 1, 2018, Cancer Genetics announced that Defendant Sharma had resigned as CEO, effective February 2, 2018.

100.   However, CW4 said that Defendant Sharma was actually forced to resign because of his poor job performance, including his poor performance related to the integration of Response Genetics.

101.   CW3 confirmed that Defendant Sharma was asked to resign by the Board of Directors.

102.   Per Sharma's LinkedIn profile, he is still unemployed as of the date of this filing.

103.   The fact that Cancer Genetics fired both its CEO and CFO during the Class Period is a powerful indicator of wrongdoing.

## CLASS ACTION ALLEGATIONS

104.   Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the publicly traded securities of Cancer Genetics during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are Defendants, present and former officer and directors of the Company, members of such excluded persons' immediate families and their legal representatives, heirs, successors or assigns, and any entity in which any such excluded person have or had a controlling interest.

105.   The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

106.   Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

107.   Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

108.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a.    whether Defendants' acts as alleged violated the federal securities laws;

b.    whether Defendants' statements to the investing public during the Class Period misrepresented material facts about the Company;

c.    whether Defendants' statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

d.      whether the Individual Defendants caused the Company to issue false
and misleading SEC filings and public statements during the Class
Period;

e.      whether Defendants acted knowingly or recklessly in issuing false and
misleading SEC filings and public statements during the Class Period;

f.      whether the prices of the Company's securities during the Class
Period were artificially inflated because of the Defendants' conduct
complained of herein; and

g.      whether the members of the Class have sustained damages and, if so,
what is the proper measure of damages.

109.   A class action is superior to all other available methods for the fair
and efficient adjudication of this controversy since joinder of all members is
impracticable. Furthermore, as the damages suffered by individual Class members
may be relatively small, the expense and burden of individual litigation make it
impossible for members of the Class to individually redress the wrongs done to
them. There will be no difficulty in the management of this action as a class action.

110.   Plaintiff will rely, in part, upon the presumption of reliance
established by the fraud-on-the-market doctrine in that:

a.      Defendants made public misrepresentations or failed to disclose
material facts during the Class Period;

b.      the omissions and misrepresentations were material;

c.      the Company's common stock was traded in an efficient market;

d.      the Company's common stock was liquid and traded with moderate to heavy volume during the Class Period; the weekly trading volume was 887,661 shares during the Class Period, which is approximately 3.2% of the Company's total shares outstanding;

e.      the Company traded on NASDAQ, and was covered by multiple analysts;

f.      the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities;

g.      More than ten market makers made a market in Cancer Genetics' stock during the Class Period;

h.      Market analysts issued reports on Cancer Genetics during the Class Period;

i.      Plaintiff and members of the Class purchased and/or sold the Company's securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts; and

j.    Unexpected material news about the Company was rapidly reflected in and incorporated into the Company's stock price during the Class Period.  For example, when the truth about the failure to integrate the acquisition of Response Genetics was disclosed, the Company's share price declined a material amount.

111.   Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

112.   Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### Violation of Section 10(b) of The Exchange Act and Rule 10b-5
### Against All Defendants

113.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

114.   This Count is asserted against the Company and the Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

115.   During the Class Period, the Company and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

116.   The Company and the Individual Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they: employed devices, schemes and artifices to defraud; made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of the Company's stock during the Class Period.

117.   The Company and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the

securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

118. Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Plaintiff and the Class.

119. As a result of the foregoing, the market price of the Company's stock was artificially inflated during the Class Period. In ignorance of the falsity of the Company's and the Individual Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a

result of the Company's and the Individual Defendants' false and misleading statements.

120.   Had Plaintiff and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by the Company's and the Individual Defendants' misleading statements and by the material adverse information which the Company and the Individual Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

121.   As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

122.   By reason of the foregoing, the Company and the Individual Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchases of the Company's securities during the Class Period.

## COUNT II

### Violation of Section 20(a) of The Exchange Act
### Against The Individual Defendants

123.   Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

124.   During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information regarding the Company's business practices.

125.   As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's business and financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

126.   Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's securities.

127.   Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complaint.

128.   By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the class representative;

B.    Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated:  October 30, 2018                  Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

By:  /s/ Laurence M. Rosen
Laurence M. Rosen
609 W. South Orange Avenue, Suite 2P
South Orange, NJ 07079
Tel: (973) 313-1887
Fax: (973) 833-0399
Email: lrosen@rosenlegal.com

*Counsel for Lead Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 30th day of October 2018 a true and correct copy of the foregoing document was served by CM/ECF to the parties registered to the Court's CM/ECF system.


<u>*/s/*  Laurence M. Rosen</u>